UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

v.     Case Number: 3:16-cr-93-J-32-JRK

CORRINE BROWN
_____/

## APPELLANT CORRINE BROWN'S
## EMERGENCY MOTION FOR COMPASSIONATE RELEASE
### *TIME SENSITIVE MOTION*

Comes now former Congresswoman Corrine Brown ("Brown"), Defendant-Appellant herein, by her undersigned appellate counsel, William Mallory Kent, and hereby moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

A. Compassionate Release and the First Step Act.

Congress first enacted the compassionate release provisions in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence.

Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part,

to abolish and replace federal parole. Congress envisioned 18 U.S.C. § 3583 as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. S. Rep. No. 98-225 at 55-56 (1983). The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for extraordinary and compelling reasons" and to permit courts "to respond to changes in the guidelines."

From the 1980s until 2018, the BOP had exclusive authority to give inmates compassionate release. On December 21, 2018, however, the President signed the First Step Act into law. Among other things, the Act transformed the process for compassionate release. First Step Act, P.L. 115-391, 132 Stat. 5194 § 603 (Dec. 21, 2018). Now, instead of depending upon the BOP to determine an inmate's eligibility for compassionate release, a court can resentence "upon motion of the defendant." A defendant can file this motion if he or she has exhausted all administrative remedies or more than 30 days have passed since "the receipt of . . . a request [for compassionate release] by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Congress's authorization of inmate-initiated motions for compassionate release was no mere procedural tweak; instead, it was a response to widespread concern that the BOP does not "properly manage" its compassionate-release program. See Dep't

of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, at 11 (Apr. 2013) ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Dep't of Justice, Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

The purpose of inmate-initiated compassionate release motions is thus to entrust the federal courts with the power to properly and compassionately apply the law governing compassionate release. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). The First Step Act's compassionate-release provisions "expand[] compassionate release . . . and expedite[] compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as . . . improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

B. The Court Has Jurisdiction over Brown's Motion for Compassionate Release.

Under the First Step Act, the Court has authority to entertain a motion for compassionate release if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf[.]" First Step Act of 2018, § 603(b), PL 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

In this case, Brown filed a request for compassionate release with the Warden of the women's camp at Coleman, Florida February 26, 2020 and received a form letter denial April 6, 2020. The BOP's denial of Brown's request for compassionate release constituted a final administrative decision from which no further appeal was permitted. 28 C.F.R. § 571.63(b). Given Brown's exhaustion of remedies, this Court has jurisdiction to consider the merits of her motion to reduce sentence.

C. The Legal Framework Governing Motions for Compassionate Release.

The section of the First Step Act entitled "Increasing the Use and Transparency of Compassionate Release" authorized courts to reduce, on the defendant's motion, a term of imprisonment if "after considering the factors set forth in section 3553(a)," the Court finds that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

The Sentencing Commission's policy statement sets forth three specific reasons that are considered "extraordinary and compelling" as well as a catchall provision recognizing as "extraordinary and compelling" any other reason "[a]s determined by the Director of the Bureau of Prisons." See USSG § 1B1.13 cmt. n.1. The policy statement also requires that "the defendant is not a danger to the safety of any other person or the community" and that the Court's decision to reduce a defendant's sentence is consistent with "the factors set forth in 18 U.S.C. § 3553(a)." Id. at § 1B1.13(2) & cmt. n.4.

As numerous courts have recognized, USSG § 1B1.13 has not been amended since the First Step Act (and likely will not be amended for some time given the lack of a quorum on the Sentencing Commission), and "some of it now clearly contradicts 18 U.S.C. § 3582(c)(1)(A)." *United States v. Cantu*, 2019 WL 2498923, at *1 (S.D. Tex. June 17, 2019); see also *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019). For this reason, "the Commission's existing policy statement provides helpful guidance on factors that support compassionate release"—"although it is not ultimately conclusive" and must be read with an eye toward Congress's overarching goal of increasing the use of compassionate release. *United States v. Bucci*, —F. Supp. 3d—, 2019 WL 5075964, at *1 (D. Mass. Sept. 16, 2019).

D. Brown Deserves Compassionate Release.

Brown deserves compassionate release because 1) her case presents extraordinary and compelling reasons supporting compassionate release; 2) she will not pose a danger to the community if released; and 3) the applicable § 3553(a) factors otherwise support her compassionate release.

1. Brown's Case Presents Extraordinary and Compelling Reasons Supporting Compassionate Release.

Brown is 73 years old. This Court has previously found that she suffers with multiple physical health ailments. Medical records confirmed by the Court as part of her presentence investigation established that she was treated by Dr. Nathan Perry, several physicians at Mayo Clinic, and physicians at Bethesda Medical Center (Washington, DC) up until her incarceration. A review by the Probation Office of medical records confirmed the following ailments and prescriptive treatments:

| Ailment | Treatment |
| --- | --- |
| Hypertension | Potassium |
| Thyroid removed | Estrogen |
| Diabetes | Metformin HCL |
| Heart murmur | |
| Acid reflux | Esomeprazole and Omeprazole |

6

| Sleep Apnea | CPAP machine (Continuous Positive Airway Pressure) |
| Cataracts | |
| Low estrogen | |

Since being incarcerated her health has declined considerably. After self-surrendering to FCC Coleman Camp on January 29, 2018, her health has deteriorated to an alarming degree.

She has developed a large diaphragmatic/hiatal hernia where at least 90% of her stomach is pressing against her lower lungs. The condition is causing a strain on her breathing and heart. Since she has been in prison, the size of her heart has enlarged (cardiomegaly), which probably was caused by hypertension. Moreover, her heart has decreased its cardiac function (ejection fraction). The combination of acid reflux into her lungs and her heart enlarging has caused her newly diagnosed asthma to worsen; her shortness of breath (dyspnea) to increase; and walking a short distance to be extremely difficult. She is currently using two different inhalers frequently during the day and has required breathing treatments. These conditions would prove fatal were she to become infected with COVID-19.

A delicate surgery has been recommended by BOP to repair the hernia. Her condition is compounded by diabetes, hypertension, high cholesterol,

hypothyroidism, sleep apnea, an elevated heart rate, feet deformity, lumbar lateral shift/back problems, knee osteoarthritis, cataracts and a B12 deficiency, which causes weakness and fatigue. Due to the poor ventilation system in the housing units, her allergies have worsened causing swollen eyes and sinus problems.

Her maternal family has a history of diabetes. She is very concerned about the possibility of having an amputation because her grandmother's leg was amputated due to diabetes. Her mother spent a month at Bethesda Naval Hospital due to diabetes - she was severely swollen and had poor circulation - and Brown has the same issues. She constantly has water retention, which causes her legs to swell (one is bigger than the other), and the skin to tighten and darken. She has numbness and swelling in her feet due to diabetic neuropathy, and is less aware of injuries and foot ulcers. These ulcers may fail to heal, which can in turn lead to serious infections. Brown has been at FCC Coleman Camp for almost 30 months, and during that time has not been under the care of an endocrinologist, which is a contributing factor to her deteriorating health.

Since she has been at FCC Coleman Camp, her diabetic, diuretic and acid reflux medications have been doubled even though she has not be seen by a specialist. She goes to the Chronic Pill Line daily. With the frequent infections that she has been having recently, she has to go twice a day, as early as 6:00 a.m. and in the afternoon.

Her conditions are worsening each day and she is in constant pain.

To make a doctor's appointment, she has to go to Sick Call. Depending on the severity of the issue, she may have to wait from two weeks to two months, and when seen the appointment will only address one issue at a time. Given the severity of her deteriorating health, she needs to have access to specialists that can address her numerous issues in a timely manner.

All of these conditions are now experienced under the constant threat of COVID-19 infection, which given Brown's age and medical conditions put her at great risk of death. The prison camp is not an environment in which inmates and staff can practice the required social isolation directed by the President and Centers for Disease Control, and once COVID-19 enters the camp it will become a source of immediate and irreversible social communication of the virus.

The CDC advises that those at the highest risk for severe illness from COVID-19 infections are "older adults and people of any age who have serious underlying medical conditions." CDC, People who are at higher risk for severe illness, COVID-19.[1] People aged 65 and older are more vulnerable to the virus. Id. So too are those with any of a host of medical issues—including conditions such as

---

[1] See https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last visited Apr. 3, 2020).

those suffered by Brown.[2] Id.

The danger of COVID-19 to high-risk individuals who are imprisoned is likely much greater than to those who are free to take their own protective measures.[3] Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others. CDC, What Law Enforcement Personnel Need to Know about Coronavirus Disease 2019, COVID-19.[4] Though the BOP has *published* a COVID-19 Action Plan, which in is supposed to include a 14-day in-cell quarantine,[5] the plan in fact is not being

---

[2] The CDC notes that the list of conditions which put persons at greater risk will continue to evolve as it learns more about COVID-19 cases in the US. https://www.cdc.gov/coronavirus/2019-ncov/faq.html#conditions (last visited Apr. 3, 2020).

[3] "Prisons are epicentres for infectious diseases because of the higher background prevalence of infection, the higher levels of risk factors for infection, the unavoidable close contact in often overcrowded, poorly ventilated, and unsanitary facilities, and the poor access to health-care services relative to that in community settings." Stuart A. Kinner, et. al., Prisons and custodial settings are part of a comprehensive response to COVID-19, THE LANCET (Mar. 17, 2020), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(20)30058-X/fulltext.

[4] See https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-law-enforcement.html. (last visited Apr. 3, 2020).

[5] See https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Apr. 3, 2020).

implemented and even if it were it would have obvious shortcomings: First, testing inside prisons is non-existent[6] — which means that statistics about the number of infections already in BOP facilities are largely meaningless. And second, the plan provides no additional protections for high-risk individuals like Brown. As such, the combination of Brown's age and deteriorating health will lead to serious complications or even death were she to contract COVID-19, which is almost inevitable if she remains at Coleman. Even were the BOP to use its best efforts, which is unlikely, the likelihood of contracting the virus is greater in prison than if Brown were able to fully self-isolate at home.

2. The Conditions for Brown at Coleman Have Reached a Crisis Stage.

The issue has reached a crisis stage with Brown being notified today that her entire unit is being moved from Unit F-2, where she has been since she voluntarily surrendered January 2018, to double bunk with another unit. The stated reason for this extraordinary move, which is flatly contrary to BOP's own published "action plan" is that Coleman is receiving today two infected inmates from a local county jail. Brown is being moved into a double bunk setting with another inmate who is

---

[6] See Coronavirus Disease Inmate Screening Tool https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_2020020 2.pdf (last visited Apr. 3, 2020). To think that the BOP is doing what civil authorities are still unable to effectively do strains credulity.

11

coughing. Something must be done urgently if Brown's life is to be protected.

      3. The BOP Conclusion Denying Relief is Wrong.

In denying her compassionate release request made to the institution a form letter was used which stated in boilerplate language that she was capable of self-care at the institution therefore did not qualify for compassionate release. This conclusion is patently wrong. The presence of COVID-19 necessitates a more expansive interpretation of what self-care means. As noted previously, the prison environment prevents Brown from being able to effectively self-isolate in the ways the CDC recommends for a person of her age and diminished health. In this moment, the inability for high risk individuals to fully self-isolate is an inability to provide self-care. So long as Brown remains in custody, her capacity to protect herself from a serious, or even fatal, infection will be compromised. The BOP is not only not providing even minimal self-distancing, but is bringing infected individuals into her facility and is double-bunking her with another person who is coughing.[7]

Only the BOP would respond to a National Emergency Pandemic in this way. This Court has the jurisdiction, power and authority to remedy this threat to Brown's health and safety and she respectfully and urgently requests this Honorable Court to

---

      [7] In January 2020 Coleman had an outbreak of Legionnaire's Disease. Brown was given antibiotic medication for Legionnaire's Disease based on her symptoms, but was not given a diagnosis.

exercise its discretionary authority to do so.

Finally, comment note 1(D) of the Sentencing Guidelines provides that a court should also consider any other reasons—alone, or in combination with those already described in the Guidelines—that may warrant compassionate release. USSG § 1B1.13, cmt. n.1(D); see *United States v. Gonzales*, WL 1536155 (E.D. Wash. Mar. 31, 2020) (finding compassionate release warranted under the "other reasons" category of USSG § 1B1.13, cmt. n.1(D)). This direction underscores that the Sentencing Guidelines are not to be read in isolation. Rather, the Court should consider a defendant's entire circumstances. There is a substantial likelihood that, despite BOP's best efforts, the virus will continue to breach prison walls. This necessarily requires considering Brown's motion in the context of the COVID-19 pandemic—that is, as a request from someone with multiple risk factors for complications from COVID-19 infection, confined in a prison environment where contagions are difficult to manage, and who is not at liberty to fully protect herself. For all of these reasons, Brown's motion presents extraordinary and compelling reasons for compassionate release.

4. Brown Will Not Pose a Danger If Released.

Brown was a Congresswoman in the United States Congress for twenty four years. She has no criminal record other than the instant offense, a fraud related

13

offense. She is clearly no danger to the community if released.

Conclusion

For the reasons stated above, Brown respectfully asks this Court to grant her request for compassionate release, reducing her sentence to time-served.[8]

---

[8] Counsel for Brown attempted to consult with opposing counsel to enlist the Government's non-opposition to this motion. Counsel for Brown called the United States Attorney's Office and asked to speak to Assistant United States Attorney Tysen Duva and was told that due to the COVID-19 emergency, that he is self-isolating at home, but that he could be reached by email, that he is receiving emails at his government email address. Counsel for Brown sent an email to AUSA Duva at his DOJ email address, but it has not been delivered. Counsel for Brown received this notification from his Outlook server:

\*\*     THIS IS A WARNING MESSAGE ONLY     \*\*
\*\*  YOU DO NOT NEED TO RESEND YOUR MESSAGE  \*\*

The original message was received at Tue, 7 Apr 2020 14:25:50 GMT from [10.187.137.70]
----- Transcript of session follows -----
<tysen.duva@usdoj.gov>... Deferred
Warning: message still undelivered after 4 hours
Will keep trying until message is 2 days old

It is ironic that counsel for Brown could not even speak to or email opposing counsel because the Department of Justice is having its attorneys self-isolate, the very relief counsel seeks for Brown.

Shortly before filing this motion, however, the email went through and a reply was received and AUSA Duva is opposed.

Respectfully submitted,

KENT & McFARLAND
ATTORNEYS AT LAW

  s/ William Mallory Kent
WILLIAM MALLORY KENT
Florida Bar Number 260738
24 North Market Street, Suite 300
Jacksonville, Florida 32202
904-398-8000 Telephone
904-348-3124 Fax
kent@williamkent.com

## CERTIFICATE OF SERVICE AND FILING

I certify that on April 8, 2020, I caused a true and correct copy of the foregoing to be served via CM/ECF upon all counsel of record (subject to the caveat of footnote 7 *supra*).

s/ William Mallory Kent<br>
William Mallory Kent